UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

MARK COULOMBE,                          :
                Plaintiff,              :
                                        :
        v.                              :       C.A. No. 14-491ML
                                        :
CAROLYN W. COLVIN, ACTING               :
COMMISSIONER OF SOCIAL SECURITY,        :
                Defendant.              :

**REPORT AND RECOMMENDATION**

Patricia A. Sullivan, United States Magistrate Judge

        In January 2012, Plaintiff Mark Coulombe was focused on ending almost twenty years of

abusing heroin, cocaine and other illicit substances; he was stabilizing on methadone and

initiating treatment for his underlying bipolar, post-traumatic stress and mood disorders.  In the

same month, he applied for social security.  The denial of his application has brought the matter

to this Court on Plaintiff's motion for reversal of the decision of the Commissioner of Social

Security (the "Commissioner"), denying Supplemental Security Income ("SSI") under §

1631(c)(3) of the Social Security Act, 42 U.S.C. § 1383(c)(3) (the "Act").  Plaintiff contends that

the Administrative Law Judge ("ALJ") erred in affording little weight to the expert medical

opinions of the examining psychiatrist, Dr. Alvaro Olivares, the treating psychiatrist, Dr. Jack

Belkin, and the treating therapist, Ms. Lisa Langlois.  Because of these errors, he argues, the

ALJ's residual functional capacity ("RFC")[1] finding is not based on substantial evidence,

requiring remand.  Defendant Carolyn W. Colvin asks the Court to affirm the Commissioner's

decision.

---

[1] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting."  20 C.F.R. § 416.945(a)(1).

These motions have been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  Having reviewed the record, I find that the ALJ improperly based his RFC on a non-examining expert whose opinion was prepared before Plaintiff's sobriety was well established, as well as on the ALJ's lay interpretation of raw medical data.  Accordingly, I recommend that Plaintiff's motion for remand (ECF No. 10) be GRANTED[2] and Defendant's motion for order affirming the decision of the Commissioner (ECF No. 12) be DENIED.

## I.    Background

Plaintiff is a younger individual, 39 years old on the date of his SSI application.  Tr. 25, 171.  After dropping out of high school in tenth grade, Tr. 70, he worked intermittently as a general laborer, landscaper, roofer, stocker, prep cook, and security guard, Tr. 198, although none of these jobs lasted long.  Tr. 68, 215.  He has lived in a sober house, with his mother and with a girlfriend.  Tr. 70.  His mother cares for his twin daughters.  Tr. 285.  Unable to drive, he uses public transportation, has no friends and goes out principally for his frequent medical appointments.  Tr. 70, 80, 231-32.  In his SSI application, Plaintiff alleged that he has been disabled due to bipolar disorder, anxiety, depression, and post-traumatic stress disorder ("PTSD") since January 1, 2010.  Tr. 19, 214.

### A.    Pre-Sobriety Mental Health History

Beginning at the age of nineteen or twenty and regularly from the age of twenty-five, Plaintiff abused various substances, including intravenous heroin, cocaine, benzodiazeprines and marijuana, and illicitly used various prescription medications such as Suboxone and Oxycontin,

---

[2] Plaintiff's motion is captioned Plaintiff's Motion to Reverse, without or, Alternatively, with a Remand for a Hearing, the Commissioner's Final Decision.  However, the body of the motion seeks remand only and does not ask for outright reversal.  See ECF No. 10 at 11.  Because the motion contains no developed argument for reversal, the argument is waived to extent it seeks such relief.  See Augustyniak Ins. Grp., Inc. v. Astonish Results, L.P., No. CA 11-464S, 2013 WL 998770, at *12 (D.R.I. Mar. 13, 2013).

until approximately the end of 2011, when he started mental health treatment at The Providence

Center.  Tr. 88-89, 274, 284, 799.  During the period of active substance abuse covered by the

medical record (2002 through January 1, 2012), Plaintiff was repeatedly hospitalized due to the

consequences of drug addiction.  Tr. 253-56 (2010 hospitalization at Landmark Hospital for

suicidal ideation and withdrawal symptoms); Tr. 262-69 (2010 hospitalization at Kent Hospital

for suicide attempt following heroin relapse); Tr. 785-89 (2010 hospitalization at Roger Williams

Hospital for suicide overdose attempt); Tr. 272-73 (2011 hospitalization at St. Joseph's Hospital

following family fight over money to buy drugs); Tr. 299-361 (Butler Hospital records reflect at

least nineteen hospitalizations from 2002 to 2007 for detox and suicide attempts).

　　　Based on mental status examinations ("MSE")[3] by an array of mental health

professionals on intake at various hospitals during the period of active substance abuse, Plaintiff

was assigned Global Assessment of Functioning ("GAF")[4] scores ranging from 30 to 35, Tr.

256, 303, 308, indicating major functional impairment, delusions, hallucinations or impaired

reality testing.  DSM-IV-TR, at 34.  Whether Plaintiff also had an underlying mental health

---

[3] A mental status examination is an objective assessment of an individual's mental ability based on personal observation, where "experienced clinicians attend to detail and subtlety in behavior, such as the affect accompanying thought or ideas, the significance of gesture or mannerism, and the unspoken message of conversation. . . . Like the physical examination, the Mental Status Examination is termed the *objective* portion of the patient evaluation." Roberts v. Astrue, No. 11cv5296–BHS–JRC, 2012 WL 834337, at *3 (W.D. Wash. Feb. 16, 2012); see 20 C.F.R. § 404, Subpt. P., App. 1, § 12.00(D)(4).

[4] The Global Assessment of Functioning "is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'" Langley v. Barnhart, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004) (quoting Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) ("DSM–IV–TR") at 32).  While use of GAF scores was commonplace at the time of Plaintiff's treatment, the 2013 update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  Santiago v. Comm'r of Soc. Sec., No. 1:13-CV-01216, 2014 WL 903115, at *5 n.6 (N.D. Ohio Mar. 7, 2014) (citing Diagnostic and Statistical Manual of Mental Disorders at 16 (5th ed. 2013) ("DSM-5").  In response, the Social Security Administration ("SSA") released an Administrative Message (AM-13066, July 22, 2013) ("SSA Admin Message") to guide "State and Federal adjudicators . . . on how to consider . . . [GAF] ratings when assessing disability claims involving mental disorders."  It makes clear that adjudicators may continue to receive and consider GAF scores as medical opinion evidence.  See SSA Admin Message at 2-6, available at http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=51489 (starting at p.19 of PDF document) (last visited Feb. 11, 2016).

impairment was impossible to ascertain; as Dr. Elahi at Landmark Hospital noted in 2010, "[it is] not clear whether [Plaintiff] was having all these symptoms in the context of ongoing use of drugs . . . needs to have an extended period of sobriety before he can be clearly diagnosed with bipolar disorder." Tr. 255-56.  While engaged in active substance abuse, Plaintiff was incarcerated three times, once for a year.  Tr. 89, 344, 799.

### B.       Post-Sobriety Mental Health History

In December 2011, Plaintiff initiated mental health treatment at The Providence Center, with methadone maintenance at CODAC.  Tr. 274.  His last use of illicit drugs was in February 2012, which he tested positive for cocaine, and in May 2012, when he tested positive for marijuana; otherwise, all screens in the record in 2012 and 2013 were negative for illicit use.  Tr. 796-97.  After a rocky start as the methadone dose was calibrated in April 2012, Plaintiff entered a new life phase characterized by compliance with prescribed medications, including methadone, and complete avoidance of "maladaptive use of . . . illegal drugs, prescription medications, and toxic substances."[5]  SSR 13-2p, 2013 WL 621536, at *3 (Feb. 20, 2013).  As a result, his mental health treatment shifted from crisis management at hospital emergency departments to a regular pattern of appointments at CODAC in connection with methadone, coupled with monthly or bimonthly appointments with his treating psychiatrist Dr. Belkin and weekly individual and group counseling sessions with therapists Lisa Langois and Marissa Tavares.  Tr. 274-90, 362-479, 795-97, 816.

---

[5] Disability benefits under the Social Security Act may not be paid for a disability to which "alcoholism and drug addictions would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled."  42 U.S.C. § 423(d)(2)(C); see SSR 13-2p, 2013 WL 621536, at *2 (Feb. 20, 2013).  Because substance abuse disorders for Social Security purposes are diagnosed by the presence of maladaptive use of illegal drugs, prescription medications and toxic substances, they do not include "addiction to, or use of, prescription medications taken as prescribed, including methadone."  SSR 13-2p, 2013 WL 621536, at *3-4.  "Substance abuse" is used in this sense in this report and recommendation.

Based on his complaint that "I was doing a lot of drugs . . . I was out of control," Plaintiff's initial assessment at The Providence Center was performed on December 13, 2011. Tr. 274-88.  At the time of this encounter, he was three and a half weeks sober "from cocaine and cannabis" and had started methadone at CODAC while living in a sober house; the assessment writer noted that his mood-related symptoms "are clouded by his chronic poly substance abuse/dependence and the subsequent impact of his functioning due to the same."  Tr. 274.  MSE findings included pressured speech, tangential and circumstantial thought process, inadequate thought content, anxious mood, constricted and anxious affect, distractible attention, poor concentration, and impaired judgment and insight.  Tr. 278-79.  Plaintiff's GAF score was assessed at 43, consistent with serious symptoms or functional impairment.  Tr. 280; see DSM-IV-TR, at 34.  The Providence Center diagnosed mood disorder and polysubstance dependence, with "mood instability as evidenced by depression and mania like behaviors and feeling states," but no acute issues.  His symptoms were deemed sufficiently serious to justify the intensive case management services of The Providence Center's "CSP" team.  Tr. 280 ("appropriate for CSP level of care based on frequency of i/p admissions (dual), poor functioning and dx criteria being met").

On January 13, 2012, Plaintiff had his first appointment with psychiatrist Dr. Belkin for "serious mental illness."  Tr. 284-88.  During the clinical interview, he reported that his psychiatric history began in childhood, when he was "in and out of institutional programs," with his first hospitalization at age 15 and a suicide attempt at 17.  Tr. 284.  He began to use heroin and cocaine at twenty and had one four-year period of sobriety from 1994 to 1997, when he was medicated with Lithium, Xanax and other medications.  Tr. 284.  Dr. Belkin's MSE included observations of elevated mood and affect, but with good control, no tangential thinking or

pressured speech, average intelligence, and apparently good insight and judgment.  Plaintiff

denied suicidal or homicidal thoughts and auditory or visual hallucinations; he seemed logical

and coherent.  Tr. 285.  Dr. Belkin diagnosed bipolar disorder and polysubstance dependence and

assigned a GAF score of 40.[6]  Tr. 285.  Plaintiff was started on Lithium and continued on

Zyprexa and Klonopin; he also was started on regular (bi-monthly) appointments with Dr. Belkin

and weekly group and individual therapy.  Tr. 286.

On February 3, 2012, Plaintiff returned to Dr. Belkin, whose notes state:

> Still has period of paranoia and overwhelming anxiety. . . Sleep is interrupted by
> nightmare once or twice a week. Energy level fluctuates: high energy for a couple
> days, then stays in bed for a full day.

Tr. 287.  The MSE findings include moderate anxiety, but otherwise Plaintiff was alert, polite,

and cooperative with no suicidal or homicidal intent, no hallucinations, average intelligence, and

capable of making informed decisions in his own medical care.  Tr. 287.  Nevertheless, Dr.

Belkin increased the Lithium dose and substituted a different anti-psychotic, Risperdal, for

Zypexa.  Tr. 287.  Three weeks later, without seeing Plaintiff again, Dr. Belkin signed his first of

three RFC opinions.

Plaintiff's next appointment with Dr. Belkin, on April 5, 2012, was an urgent visit

triggered by a financial issue that was causing CODAC to taper him off methadone.  Tr. 370.

The treating notes reflect that Plaintiff was sweating excessively, very uncomfortable, anxious,

and sleeping poorly.  Tr. 370.  Dr. Belkin opined that, although Plaintiff was not "exhibiting

mania or mixed bipolar but definitely at risk for it;" to "avoid a true decompensation," Dr. Belkin

increased the doses of Klonopin and Lithium and noted that Klonopin might need to be increased

further.  Tr. 370.

---

[6] A GAF of 40 is at the high end of the range reflecting "some impairment in reality testing or communication . . .
[or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."
DSM-IV-TR, at 34.

In early July 2012, The Providence Center team, including Dr. Belkin, prepared Plaintiff's Treatment Plan Review.  It assessed Plaintiff as "making progress" on psychiatric stability, but "no progress" on decreasing methadone reliance or seeing his children.  The team assessed Plaintiff with a GAF stuck at 40,[7] in both the current month and over the past year.  Tr. 411-14.  In light of these symptoms, the Plan recommended that treatment continue at the same level of intensity.

By the next Belkin appointment, on July 27, 2012, Plaintiff's methadone treatment had resumed (as a result of financial assistance from his mother) and stabilized, although he was not making progress towards the goal of reducing methadone to nothing.  Tr. 412, 420.  Dr. Belkin recorded that an increase in obsessive behaviors was causing family friction, but also noted that, with almost eight months of sobriety, he was "feel[ing] great."  Tr. 420.  Obsessive compulsive disorder was added to Plaintiff's list of diagnoses and a prescription for Anafranil was introduced to address it.  Tr. 420.  On MSE, Plaintiff had mildly elevated mood, but was not hypomanic or manic, with rapid speech, but no abnormal volume or content.  He was alert, verbal, cooperative, and polite, with no suicidal or homicidal ideation and no hallucinations.  Tr. 420.

Dr. Belkin next saw Plaintiff on September 21, 2012, and noted that Anafranil was working well; his MSE reflects no abnormal findings.  Tr. 439.  However, the next record is Dr. Belkin's report on Plaintiff's mental health status to CODAC dated October 31, 2012; in it, Dr. Belkin advises that Plaintiff suffers from "significant mental illness," and is prescribed to take Anafranil, Lithium, Risperdal and Klonopin, although his prognosis was "improving" in that he appeared cooperative in seeking and maintaining treatment.  Tr. 457.

Plaintiff's last pre-hearing appointment with Dr. Belkin was on December 27, 2012.  Tr. 472.  Dr. Belkin noted that he was "[f]eel[ing] very stressed by a 'whirlwind around me' . . .

---

[7] See n.6, supra.

remaining clean and sober but the urge to use is great as he tries to deal with all these issues."

Tr. 472.  While setting the next appointment for two months later, Dr. Belkin also noted that

Plaintiff should return sooner if necessary.  Tr. 472.  Nevertheless, Dr. Belkin's MSE reflects no

abnormal findings, recording that Plaintiff was alert, animated, logical, coherent, and polite, with

non-pressured speech and euthymic mood, no suicidal or homicidal ideation and no voices or

visions.  Tr. 472.  In March 2013, Dr. Belkin signed the second of his three RFC opinions.  Tr.

793.

The record includes two post-hearing appointments with Dr. Belkin in April and July

2013.[8]  Tr. 37, 43.  These reflect that, in April, Plaintiff was overwhelmed by circumstances

including the declining health of his longtime girlfriend and was "[w]orried about his own

mental health," yet was otherwise "[s]table no acute complaints," with a normal MSE.  Tr. 37.

In July 2013, Dr. Belkin's MSE included abnormal findings of anxious mood and varying sleep

disturbance but no substance abuse.  Tr. 43.  Also added to the post-hearing record is Plaintiff's

July 2013 Treatment Plan Review, which was prepared and signed by The Providence Center

treating team, including Dr. Belkin.[9]  Tr. 59.  Based on diagnoses of bipolar disorder,

polysubstance dependence and obsessive compulsive disorder and a current GAF of 45, but only

40[10] in the prior year, the Plan called for Plaintiff to remain at the intensive CSP-level of

treatment, with individual and group therapy weekly or more frequently if needed and

appointments with Dr. Belkin every three months.  Tr. 59-62.  The Plan notes, "Currently, client

---

[8] These records were submitted to, and considered by, the Appeals Council.  Tr. 2.

[9] Even though it was prepared post-hearing, the 2013 Plan is relevant to the period under adjudication because it includes a one-year look-back.  It is also significant that the referenced "prior year," for which a GAF of 40 was assessed by the Providence Center treating team, he was entirely substance-free and stabilized on methadone treatment.

[10] For a description of the meaning of a GAF of 40, see n.6, *supra*.  A GAF of 45 to 50 reflects serious symptoms or some serious impairment in an area of functioning.  DSM IV-TR, at 34.

is not making progress.  Client has an impaired ability to function related to emotional distress secondary to psychosocial problems."  Tr. 60.

Throughout the period of treatment with Dr. Belkin, Plaintiff was also attending weekly individualized therapy and weekly group therapy at The Providence Center with various therapists.  Tr. 39-41, 362-481.  Because of the frequency of the appointments, the records are too voluminous to itemize except to note that, after he stabilized on methadone in April 2012, from time to time, he continued to exhibit such symptoms as disheveled appearance, overtalkative or pressured speech, racing thoughts, flight of ideas, incongruent affect, and anxious mood, although most of the MSE findings are normal.  See, e.g., Tr. 381, 397, 401, 422, 445.  For example, at an appointment at which his therapist opined that his condition was improved, she also noted that it required "some re-directing" for her to "manage" to get him to complete treatment-related paperwork, that he was having trouble containing his emotions and that he attempted to go into lengthy rants.  Tr. 409.  Nevertheless, over the course of the period, many of these therapists' MSEs resulted in few, and sometimes no, negative findings.  See, e.g., Tr. 425, 440, 479.

C.     **Opinion Evidence**

On February 28, 2012, Dr. Belkin signed his first of three opinions after two appointments[11] with Plaintiff.  Tr. 104-07.  In it, he described Plaintiff's symptoms as paranoia and "overwhelming anxiety," which are "problems, separate and apart from the history of substance abuse," and opined that Plaintiff cannot sustain competitive employment because of "paranoia – fluctuating energy stays in bed for a full day."  Tr. 104-05.  In his RFC opinion, he found severe limitations in social functioning; moderately severe limitations in activities of daily

---

[11] Dr. Belkin's note on the form indicates that he had had only "one visit."  Tr. 104.  The record establishes that, as of February 28, 2012, Dr. Belkin had seen Plaintiff twice.  Tr. 284, 287.

living and in the ability to respond to supervisors, co-workers, and customary work pressures and to perform varied tasks; moderate limitations in interests, personal habits, attention and concentration and the ability to perform complex tasks; and mild restrictions in the ability to understand, carry out, and remember instructions and to perform simple tasks.  Tr. 293-94.  On the next day, Dr. Belkin's colleague, therapist Lisa Langlois, opined to similar conclusions.[12]  Tr. 295-98.

The next material[13] opinion is from Dr. Michael Slavit, a non-examining state agency psychologist, who opined on May 24, 2012, that Plaintiff has no memory limitations, is only mildly restricted in activities of daily living, has moderate difficulties in social functioning, concentration, persistence or pace, and has had only one or two episodes of decompensation.  Tr. 123-25.  Written as Plaintiff's struggle to achieve sobriety was in its final stage,[14] Dr. Slavit noted that "claimant's substance dependence is his primary impairment," but that the record reflects "improvement in his functioning with treatment and reported abstinence."  Tr. 127. Based on this finding, Dr. Slavit predicted that, without substance abuse, Plaintiff will be able to sustain a two-hour/eight-hour schedule at routine tasks with brief, superficial interactions, while, with active substance abuse, his concentration, persistence and attendance would be diminished,

---

[12] Ms. Langlois's opinion may have been prepared after only one appointment on January 27, 2012; however, this appointment is mentioned as having been scheduled but there is no record reflecting that it occurred. Tr. 290.  More likely, she wrote the opinion before her first appointment of record, which was on March 14, 2012. Tr. 362. Because her opinion is contemporaneous with her statement that she lacked sufficient knowledge of Plaintiff to opine about his work-related limitations, Tr. 290, I find that the ALJ's decision to afford her RFC "little weight" is well supported by substantial evidence.  Her opinion will not be discussed further in this report and recommendation.  See Tr. 24-25.

[13] Dr. Russell Phillips is the other non-examining psychologist who reviewed Plaintiff's medical record.  He found only mild difficulty with social functioning, no limits in the ability to carry out detailed instruction and no social interaction limitations.  Tr. 112-13.  Because the ALJ did not assign any weight to this opinion and Plaintiff has raised no complaint about this determination, Dr. Phillips's opinion will not be discussed further.

[14] Plaintiff's last lapse, reflected in a positive drug screen for marijuana, occurred in the same month (May 2012) when Dr. Slavit signed his opinion.  Tr. 86-87, 797.

and his ability to make workplace decisions and adapt to workplace changes would be inadequate.  Tr. 126-27.

Almost a year later, on March 5, 2013, Plaintiff underwent a consultative psychiatric examination with a psychiatrist, Dr. Alvaro Olivares, at the request of his attorney.  Tr. 798-801. By the time he saw Dr. Olivares, Plaintiff had been completely abstinent since May 2012 and largely substance-free for more than a year, as well as fully compliant with his regime for psychiatric medications.  Tr. 799.  Dr. Olivares performed a clinical interview and MSE and administered as array of cognitive functioning capacity tests.  Tr. 800.  His report highlights Plaintiff's psychiatric illness in childhood and adolescence (including the need for residential treatment in adolescence), all before he started to use drugs, as well as the continuing signs and symptoms of bipolar disorder even during periods when he was substance free.  Tr. 798-99.  He concluded that, "[d]espite being completely substance free and being compliant with psychotropic medications he still describes signs and symptoms consistent with Bipolar Disorder as well as Post Traumatic Stress Disorder."  Tr. 799.

Dr. Olivares's MSE observations include tearfulness, feelings of worthlessness, difficulty falling asleep with frequent awakening, recurrent flashbacks and nightmares, persistent symptoms of increased arousal such as hypervigilance, exaggerated startled response, difficulty concentrating, and irritability, slightly pressured speech, and tangential thought process with loose associations; on the positive side, he noted that Plaintiff was alert and casually dressed, had good eye contact, and denied suicidal and homicidal ideation, delusions and hallucinations.  Tr. 800.  Plaintiff's cognitive function tests established severe impairments in concentration and memory, "so severe that he would not be able to maintain any persistent pace where registering and recalling information is so difficult for him," as well as "minimum ADL skills."  Tr. 800-01.

11

Dr. Olivares diagnosed bipolar disorder, type I, PTSD, polysubstance dependence in full remission, with a GAF score of 45-50,[15] based on "the severity of his social and occupational impairment with severe social isolation."  Tr. 801.  Separate from his report, Dr. Olivares provided a "Psychiatric Review Technique," which found marked impairment in all three of the "B" criteria spheres, and an RFC, which found severe limitations in nearly every work-related function category.  Tr. 802-15.

Also in March 2013, Dr. Belkin, who by then had been Plaintiff's treating psychiatrist for well over a year, signed his second RFC opinion.  Tr. 793.  In it, he opined that Plaintiff's symptoms are "at times" severe and that they include increased anxiety, as well as "elevated mood, labile, isolates self in the house stay in bed teary."  Tr. 793.  While this opinion reflects that Plaintiff's RFC is improved from Dr. Belkin's February 2012 opinion, it nevertheless reflects severe limitations in the ability to respond to co-workers; moderately severe restrictions in social functioning, the ability to respond to the general public and customary work pressures; moderate restrictions in activities of daily living, attention and concentration, and the ability to respond to supervision.  Tr. 794.

Almost a year later, Dr. Belkin's third opinion was submitted to the Appeals Council, which considered it but concluded that it is not relevant because it pertains to the period after the ALJ's decision.  Tr. 2, 7.  In the third opinion, Dr. Belkin assessed Plaintiff's symptoms as moderate, but his RFC reflects severe limitations in the ability to respond to coworkers and moderately severe limitations in the ability to concentrate, respond to supervision or the public or to customary work pressures.  Tr. 9.

## II.     <u>Travel of the Case</u>

---

[15] These GAF scores are in the range described in n.10, *supra*.

Plaintiff filed his application for Supplemental Security Income ("SSI") payments on January 19, 2012. Tr. 171-79. It was denied initially and on reconsideration. Tr. 108-31, 134-39. On March 27, 2013, the ALJ held a hearing at which Plaintiff, who was represented by counsel, and a vocational expert appeared and testified. Tr. 63-102. On April 11, 2013, the ALJ issued a decision finding that Plaintiff was not disabled at any time since his SSI application date, and was therefore not entitled to receive benefits. Tr. 17-27. The Appeals Council denied Plaintiff's request for review on September 9, 2014, Tr. 1-4, rendering the ALJ's decision the final decision of the Commissioner. Plaintiff timely filed this action.

III.   **The ALJ's Hearing and Decision**

At the March 27, 2013, hearing, Plaintiff testified that he cannot work because there are days when his behavior and bipolar get in the way, he may not sleep or he may be unable to get out of bed, he lashes out at people and has difficulty getting along with others, at times "doing things out of the ordinary, acting strange." Tr. 79-81. He described how his difficulties concentrating and focusing and his inability to get along with others caused him to be fired from job after job and to lose all his friends. Tr. 73-78. While therapy has helped to a degree, he still needs to have regular appointments with Dr. Belkin, who he used to see every three months, but was recently changed to once per month. Tr. 84-85. Unable to drive, Plaintiff reported that he takes the bus, but if he hears too much talking on the bus or there is something that he cannot handle, overwhelming anxiety sometimes forces him to get off and wait for another. Tr. 94-95.

The ALJ issued his decision based on the familiar five-step sequential evaluation process, see 20 C.F.R. § 416.920(a)(4), finding at Step One that Plaintiff had not engaged in substantial gainful activity since the application date. Tr. 19. At Step Two, the ALJ found an array of severe impairments: PTSD, mood disorder, and bipolar disorder, but excluded substance abuse,

finding that Plaintiff had been sober during most of the adjudication period.[16]  Tr. 19.  At Step

Three, the ALJ found that Plaintiff does not have an impairment or combination of impairments

that meet or medically equal a listed impairment in the Listing of Impairments, 20 C.F.R. Part

404, Subpart P, Appendix 1.  Tr. 20.

      In his RFC finding, the ALJ determined that Plaintiff retains the capacity to perform

work at all exertional levels, but with non-exertional limitations, including understanding,

remembering, and carrying out only simple, routine, repetitive tasks, the need for breaks every

two hours, no interaction with the general public, and occasional, work-related, non-personal,

and non-social interaction with co-workers and supervisors involving no more than a brief

exchange of information or hand-off of a product.  Tr. 21.  At Step Four, the ALJ found that

Plaintiff's prior work history was so sporadic as to support a finding that he had no past relevant

work.  Tr. 25.  At Step Five, based on the testimony of the vocational expert, the ALJ found that

Plaintiff could perform jobs existing in significant numbers in the national economy and

concluded that Plaintiff was not disabled from January 9, 2012, through the date of the decision.

Tr. 26-27.

**IV.**    <u>**Issues Presented**</u>

      Plaintiff contends that substantial evidence does not support the ALJ's finding that the

expert medical opinions of the examining psychiatrist Dr. Olivares and the treating psychiatrist

---

[16] Although Plaintiff alleged onset commencing two years prior to the filing of his application (on January 1, 2010), a period to which substance abuse was plainly a material contributor, the ALJ properly focused on the post-application period because an SSI application requires the adjudicator to consider whether the applicant is disabled for the period beginning with the date of the filing of the application.  20 C.F.R. § 416.335.  Based on Plaintiff's sobriety during most of this period, the ALJ made the unchallenged finding that "the claimant's history of abuse is not material to the finding of disability because he has been sober during most of the adjudication period."  Tr. 19.

Dr. Belkin merited little weight.[17]  He also challenges the ALJ's RFC finding, arguing that it is not supported by substantial evidence.

## V.      <u>Standard of Review</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  <u>Ortiz v. Sec'y of Health & Human Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); <u>Rodriguez v. Sec'y of Health & Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981); <u>Brown v. Apfel</u>, 71 F. Supp. 2d 28, 30 (D.R.I. 1999).  Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact.  <u>Rodriguez Pagan v. Sec'y of Health & Human Servs.</u>, 819 F.2d 1, 3 (1st Cir. 1987); <u>see also</u> <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991); <u>Lizotte v. Sec'y of Health & Human Servs.</u>, 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole. <u>Brown</u>, 71 F. Supp. 2d at 30; <u>see also</u> <u>Frustaglia v. Sec'y of Health & Human Servs.</u>, 829 F.2d 192, 195 (1st Cir. 1987); <u>Parker v. Bowen</u>, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).  Thus, the Court's role in reviewing the Commissioner's decision is limited.  <u>Brown</u>, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner.  <u>Id.</u> at 30-31 (citing <u>Colon v. Sec'y of Health & Human Servs.</u>, 877 F.2d 148, 153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not

---

[17] Plaintiff also challenged the finding of "little weight" given to the RFC opinion of therapist, Lisa Langlois.  Tr. 24-25.  For the reasons set out in n.12, *supra*, I find that the ALJ's determination regarding Ms. Langlois's opinion is well grounded in substantial evidence and do not recommend remand on this basis.

the courts." Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).  A claimant's

complaints alone cannot provide a basis for entitlement when they are not supported by medical

evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20

C.F.R. § 416.929(a).

　　　The Court must reverse the ALJ's decision on plenary review, if the ALJ applies

incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that

the law was applied properly.  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam);

accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991).  Remand is unnecessary

where all of the essential evidence was before the Appeals Council when it denied review, and

the evidence establishes without any doubt that the claimant was disabled.  Seavey v. Barnhart,

276 F.3d 1, 11 (1st Cir. 2001) (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

　　　The Court may remand a case to the Commissioner for a rehearing under Sentence Four

of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences.

Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).

　　　To remand under Sentence Four, the Court must either find that the Commissioner's

decision is not supported by substantial evidence, or that the Commissioner incorrectly applied

the law relevant to the disability claim.  Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621

F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but

also was insufficient for district court to find claimant disabled).  Where the Court cannot discern

the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow

an explanation of the basis for the decision.  Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir.

2001).  On remand under Sentence Four, the ALJ should review the case on a complete record,

including any new material evidence.  Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983)

(necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council).  After

a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus

loses jurisdiction.  Freeman, 274 F.3d at 610.

>       In contrast, Sentence Six of 42 U.S.C. § 405(g) provides:
>
>       The court . . . may at any time order additional evidence to be taken before the
>       Commissioner of Social Security, but only upon a showing that there is new
>       evidence which is material and that there is good cause for the failure to
>       incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g).  To remand under Sentence Six, the claimant must establish: (1) that there is

new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that

there is a reasonable possibility that it would change the administrative result; and (3) there is

good cause for failure to submit the evidence at the administrative level.  See Evangelista v.

Sec'y of Health & Human Servs., 826 F.2d 136, 139-43 (1st Cir. 1987).

>       With a Sentence Six remand, the parties must return to the Court after remand to file

modified findings of fact.  Jackson, 99 F.3d at 1095 (citing Melkonyan v. Sullivan, 501 U.S. 89,

98 (1991)).  The Court retains jurisdiction pending remand and does not enter a final judgment

until after the completion of remand proceedings.  Id.

**VI.**    **Disability Determination**

>       The law defines disability as the inability to do any substantial gainful activity by reason

of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than

twelve months.  42 U.S.C. § 416(I); 20 C.F.R. § 416.905.  The impairment must be severe,

making the claimant unable to do previous work, or any other substantial gainful activity which

exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 416.905-911.

>       **A.**    **Treating Physicians and Other Sources**

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise.  See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 416.927(c).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  Konuch v. Astrue, No. 11-193L, 2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 416.927(c)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988).  The ALJ's decision must articulate the weight given, providing "good reasons" for the determination.  See Sargent v. Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where ALJ failed to point to evidence to support weight accorded treating source opinion, court will not speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).  When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the

opinion.  20 C.F.R § 416.927(c).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  See 20 C.F.R. § 416.927(c)(2).

A treating source who is not a licensed physician or psychologist[18] is not an "acceptable medical source."  20 C.F.R. § 416.913; SSR 06-03p, 2006 WL 2263437, at *2 (Aug. 9, 2006). Only an acceptable medical source may provide a medical opinion entitled to controlling weight to establish the existence of a medically determinable impairment.  SSR 06-03p, 2006 WL 2263437, at *2.  An "other source," such as a nurse practitioner or licensed clinical social worker, is not an "acceptable medical source," and cannot establish the existence of a medically determinable impairment, though such a source may provide insight into the severity of an impairment, including its impact on the individual's ability to function.  Id. at *2-3.  In general, an opinion from an "other source" is not entitled to the same deference as an opinion from a treating physician or psychologist.  Id. at *5.  Nevertheless, the opinions of medical sources who are not "acceptable medical sources" are important and should be evaluated on key issues such as severity and functional effects, along with other relevant evidence in the file.  Id. at *4.

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 416.927(d).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity ("RFC"), see 20 C.F.R. §§ 416.945-946, or the application of vocational factors because that ultimate

---

[18] The regulations recognize other categories of providers as acceptable medical sources for certain impairments; for example, a licensed optometrist is acceptable for measurement of visual acuity and visual fields.  SSR 06-03p, 2006 WL 2263437, at *1.

determination is the province of the Commissioner.  20 C.F.R. § 416.927(d); see also Dudley v. Sec'y of Health & Human Servs., 816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

## VII.   Analysis

Plaintiff's appeal focuses on the ALJ's decision to ignore all of the treating source opinions[19] about Plaintiff's functional limitations, to reject the expert opinions of the treating psychiatrist, Dr. Belkin, and the consulting psychiatrist, Dr. Olivares, and to rely instead on the opinion of the non-examining psychologist, Dr. Slavit, which was formed without the benefit of the treating record developed after Plaintiff achieved sobriety and compliance with prescribed medication.  With no post-sobriety alternative expert, the ALJ instead formed his RFC based on his lay interpretation of the raw MSE evidence in Dr. Olivares's report and in The Providence Center treating records.  Because I find that these determinations are errors that leave the RFC determination without the required grounding in the substantial evidence of record, I recommend that this Court remand the matter for further proceedings.

Beginning with Dr. Olivares, the ALJ rested the determination to afford his extensive report and opinions little weight on his findings that the opinion is inconsistent with Dr. Olivares's own MSE findings and that the opinion "appears mostly based on subjective report of symptoms."  Tr. 24.  Both findings are without merit.  First, Dr. Olivares's MSE is replete with abnormal clinical observations, including pressured speech, tangential thought process, loose associations, "up and down" mood and constricted affect with frequent tearfulness.  Tr. 800.  To conclude that these abnormal findings are somehow inconsistent with Dr. Olivares's opinion requires medical expertise that the ALJ lacks.  Nguyen, 172 F.3d at 35 ("As a lay person,

---

[19] In addition to Dr. Belkin's treating opinions, such as the one sent to CODAC, Tr. 457, these opinions include the GAF scores assessed by The Providence Center team.  SSA Admin Message, at 4 ("a GAF rating is a medical opinion as defined in 20 CFR §§ 404.1527(a)(2) and 416.927(a)(2) . . . [w]hen case evidence includes a GAF from a treating source and you do not give it controlling weight, you must provide good reasons").

however, the ALJ was simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the determination."); Bossi v. Astrue, No. CIV. 09-60-P-H, 2009 WL 3633230, at *6 n.5 (D. Me. Oct. 31, 2009) (ALJ's decision illustrates pitfalls of layperson's interpretation of raw medical evidence in MSE findings). Similarly, the ALJ's finding that Dr. Olivares based his opinion "mostly" on Plaintiff's subjective reports ignores not only the abnormal MSE findings, but also disregards Dr. Olivares's testing, the results of which formed the foundation for Dr. Olivares's opinion that Plaintiff suffered from severe impairments of memory and concentration, among others. See Tr. 800 ("Cognitive functioning testing confirmed the severity of concentration impairment and consequent short term deficits").

The Commissioner struggles to buttress the ALJ's findings regarding Dr. Olivares by arguing that the opinion is inconsistent with the post-sobriety treating MSEs of record since August 2012, which generally do not reflect significant abnormalities, except for anxious mood and over-talkative or pressured speech. Tr. 425-26, 439-41, 445-46, 465, 472. There is no question that the many MSEs in this record do appear – to the lay reader – to have mostly neutral findings. The rub comes when other observations and opinions in the same treating records are considered. See Dodge v. Colvin, No. C13-1701-JCC, 2014 WL 2608204, at *8 (W.D. Wash. June 11, 2014) ("To simply conclude that an opinion is internally inconsistent because 'the claimant had a perfect score on a MMSE,' . . . is a gross distortion of the record and disregards the precise impairment the ALJ found severe."). The MSE observations that are interpreted by the ALJ as reflective of "moderate functional limitations," Tr. 25, are consistently interpreted by the same treating providers who performed them as reflective of either "major impairment in several areas" or "serious impairment in social, occupational, or school functioning." DSM-IV-TR, at 34; see Tr. 280, 285, 411 (over course of treatment, The Providence Center treating team

assessed GAF scores between 40 and 45).  To reach the conclusion that the treating records are

inconsistent with Dr. Olivares's opinion, the ALJ had to draw medical conclusions from raw

medical data, which he lacks the capacity to do.  Reid v. Colvin, No. 14-CV-0250-BJR-JLW,

2015 WL 418933, at *7 (W.D. Wash. Jan. 30, 2015) (by crediting MSE findings while

discounting opinion of psychiatrist who performed MSEs, ALJ improperly substitutes his own

judgment for that of psychiatrist); see Nguyen, 172 F.3d at 35 n.3 (treating source opinion that

claimant was incapacitated consistent with reports of other treating physicians); Silva v. Colvin,

No. CA 14-301 S, 2015 WL 5023096, at *14-15 (D.R.I. Aug. 24, 2015) (error for ALJ to

interpret and rely on some of medical expert's raw data, but to reject that expert's own

interpretations of same data).

The same flaw taints the ALJ's decision to discount the opinions[20] of treating psychiatrist

Dr. Belkin, who opined that Plaintiff suffered "moderately severe" deficits in multiple fields of

functioning, making him unable to sustain competitive, full-time employment.  Tr. 291-94; 793-

94.  The ALJ ruled that these treating medical opinions merited "little weight," as they are

inconsistent with Dr. Belkin's own MSEs, as well as with those of the therapists working under

him at The Providence Center.  Tr. 24.  As with Dr. Olivares, this conclusion required the ALJ to

apply his own interpretation to Dr. Belkin's MSE results and to ignore the balance of Dr.

Belkin's treating notes for the same encounters.

Three examples illustrate the problem.  First, the ALJ's decision focuses on Dr. Belkin's

notes from an appointment on January 13, 2012, Tr. 284, in which Dr. Belkin's MSE refers to

"elevated mood and affect but within good control, . . . no tangential thinking, . . . not pressured

---

[20] Dr. Belkin supplied three opinions.  While the first of the three could be discounted because of the relatively short treating relationship and Plaintiff's ongoing struggle with the vestiges of substance abuse, and the third was rejected by the Appeals Council as unrelated to the adjudication period, the second was signed well into the period of sobriety and well over a year into the treating relationship.  It is the one that cannot be ignored.

in his speech, . . . logical and coherent, . . . average intelligence, . . . not suicidal or homicidal, . . . no auditory or visual hallucinations." Tr. 22 (citing Tr. 285). The ALJ relies on these MSE references, but discounts the GAF of 40 assessed by Dr. Belkin at the same appointment. Tr. 22, 25. Second, the decision highlights a July 5, 2012, therapy session with Ms. Langlois, Tr. 407, and focuses on her observations that Plaintiff was improved, appropriate in appearance and affect, and cooperative in behavior. Tr. 23. The decision ignores Ms. Langlois's note at the same appointment describing her difficulty in getting Plaintiff to focus long enough to review and sign his new treatment plan, as well as her observation that he was "still having trouble containing his emotions and . . . [a]ttempted to go into lengthy rants about others in his life which he has already shared but writer was able to keep re-directing him back to himself." Tr. 409. It also ignores her endorsement of a GAF of 40 (in both current month and past year) in the Treatment Review Plan signed the same day. Tr. 411. Third, at Plaintiff's July 27, 2012, appointment, Dr. Belkin recorded an increase in obsessive behaviors serious enough to add obsessive compulsive disorder to Plaintiff's list of diagnoses and to add a new prescription to Plaintiff's list of medications; he ordered Plaintiff to follow up in four weeks. Tr. 420. The ALJ ignored these entries and focused instead on the MSE. Tr. 420 ("alert and verbal. Cooperative and polite. Mildly elevated mood but not hypomanic or manic. Average intelligence. No SI/HI. No hallucinations. Speech rapid with normal rhythm volume and content. . . . Capable of making informed decisions in his own medical care").

Throughout his decision, the ALJ highlighted these and similar MSE findings, ignoring the other notations in the same records, and interpreting the selected MSE finding as supportive of his conclusion that Plaintiff's "[m]ental status exams . . . were . . . not so severe as to suggest more than moderate functional limitations." Tr. 25. As the First Circuit in Nguyen makes clear,

in such a circumstance – when the treating doctor repeatedly opines that the claimant has

incapacitating limitations, and the ALJ rejects the opinion based on his own judgment that the

opinion is inconsistent with "actual findings made on exam" – remand is required.  172 F.3d at

35.

It must be emphasized that this is not a case where the ALJ has encountered inconsistent

medical evidence and selected the opinion of one provider over the opinion of another.

Thibodeau v. Soc. Sec. Admin. Comm'r, No. 1:13-CV-00037-NT, 2014 WL 1908950, at *3 (D.

Me. May 12, 2014) (ALJ has discretion to resolve conflicts among expert opinions by according

great weight to opinion of a non-examining, consulting expert).  Nor is it a case where the ALJ

was simply commenting on the lack of evidence.  Furr v. Astrue, No. CIV. 08-434-P-S, 2009

WL 3336113, at *6 (D. Me. Oct. 15, 2009).  Rather, this is a case where the ALJ has

reinterpreted the raw data in the treating source's notes to conclude that observations interpreted

by Dr. Belkin as moderately severe or severe are really just mild or moderate.  It is noteworthy

that every medical provider who had direct contact with Plaintiff – including both the consulting

and treating psychiatrists and all of the therapists on The Providence Center team – opined to

similar GAF scores, placing Plaintiff's symptoms and functional limitations in the serious or

major impairment range.  See Tr. 280 (on December 13, 2011, The Providence Center intake

assesses GAF at 43); Tr. 285 (on January 13, 2012, Dr. Belkin's psychiatric evaluation assesses

GAF of 40); Tr. 411 (on July 5, 2012, The Providence Center treatment plan review assesses

GAF at 40, 40 in past year); Tr. 801 (on March 5, 2013, Dr. Olivares assesses GAF at 45-50); Tr.

59 (on July 31, 2013, The Providence Center plan review assesses GAF at 45, 40 in past year).[21]

Only the ALJ, in reliance on his own interpretation of a cherry-picked set of raw medical

---

[21] These constitute all of the GAF scores in the record for the period after Plaintiff began treatment at The
Providence Center; once he achieved sobriety, no provider or other source ever assessed Plaintiff with a GAF score
above 50.

evidence, concluded that Plaintiff's post-substance abuse symptoms were causing only moderate

functional limitations.  See Nguyen, 172 F.3d at 35 (error for ALJ "to ignore medical evidence or

substitute his own views for uncontroverted medical opinion").

The ALJ's reliance on the file review performed by Dr. Slavit does not render this error

harmless.  The reviewing psychologist opined that, with substance abuse, Plaintiff's ability to

make workplace decisions and to adapt to workplace changes would be inadequate; it is his

*prediction* that the elimination of substance abuse would result in a recovery of functional

capacity sufficient to permit work.  Tr. 126-27.  The Commissioner concedes that Dr. Slavit

formed his opinion in May 2012, prior to Plaintiff's extended period of sobriety and treatment

compliance.  Silva, 2015 WL 5023096, at *13 (remand required where ALJ relied on state

agency reviewers' predictions that claimant's cognitive functioning would continue to improve,

but record establishes that did not happen).  An opinion based on a file review cannot constitute

substantial evidence of the claimant's mental RFC if it was prepared before substantial new

material is added.  Alcantara v. Astrue, 257 F. App'x 333, 334 (1st Cir. 2007) (per curiam) (if

ALJ performs his own interpretation of newly added material, he improperly substitutes his own

judgment for medical opinion); Bossi, 2009 WL 3633230, at *6 (opinion prior to addition of

significant volume of new material cannot constitute substantial evidence when critical to RFC

determination).  Compounding the error, the ALJ misinterpreted Dr. Slavit's opinion, which

makes clear that, with substance abuse, Plaintiff could not work because his "ability to make

workplace dicions [sic] and to adapt to workplace changes would be inadequate."  Tr. 127.  The

ALJ tries to sidestep this aspect of Dr. Slavit's opinion, inexplicably dismissing this conclusion

as it "would not seem to be inconsistent with the ability to understand, remember, and carry out

simple, routine, repetitive tasks."  Tr. 25 n.4.

There is no question that The Providence Center treating records contain many intact findings on mental status examination.  There is also no question that The Providence Center team consistently summarized their findings as reflective of severe or major symptoms/ limitations or, as Dr. Belkin wrote in his report to CODAC, of "significant mental illness."  Tr. 457.  I find that the ALJ's bases for discounting the only opinion evidence from providers who had direct contact with Plaintiff or who considered Plaintiff's symptoms and limitations after he achieved sobriety – those from Dr. Olivares, Dr. Belkin and The Providence Center team – do not amount to "good reasons."  Although the ALJ is entitled to resolve conflicts in the evidence and determine the ultimate question of disability, see Rodriguez, 647 F.2d at 222, as a lay person, the ALJ is not permitted "to interpret raw medical data in functional terms."  Nguyen, 172 F.3d at 35; Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 430 (1st Cir. 1991) ("Since bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess claimant's residual functional capacity based on the bare medical record.").  Where the extent of functional loss due to Plaintiff's mental illness and its effect on Plaintiff's work-place functional capacity is far from readily apparent, Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 17 (1st Cir. 1996), and no RFC assessment from an expert supports the ALJ's RFC finding, save a "prognosis" from a non-examining source, the Court cannot conclude that the ALJ's RFC determination is supported by substantial evidence of record.  Accordingly, the matter must be remanded for further assessment of Plaintiff's RFC, potentially including evaluation of the complete medical record by a qualified physician or psychologist.  Prentice v. Astrue, No. CIV. A. 06-385 M, 2008 WL 910058, at *6-7 (D.R.I. Mar. 31, 2008).

**VIII.   Conclusion**

I recommend that Plaintiff's Motion to Reverse, without or, Alternatively, with a Remand for a Hearing, the Commissioner's Final Decision (ECF No. 10) be GRANTED and Defendant's Motion for Order Affirming the Decision of the Commissioner (ECF No. 12) be DENIED.  I further recommend that the matter be REMANDED to the Commissioner for further proceedings consistent with this report and recommendation pursuant to Sentence Four of 42 U.S.C. § 405(g), and final judgment should enter in favor of Plaintiff.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
February 19, 2016